## Vasconi Adoption

*Thomas C. Cochran* and *Eugene E. Anderson,* for petitioner.

*Martin E. Cusick,* for respondent.

ROWLEY, P. J., June 15, 1950.—This matter is before the court upon preliminary objections to a petition to revoke a decree of adoption.

In considering the instant petition we are warranted in accepting the truth of material facts averred in the petition for revocation; however, we may not accept as verity inferences, or conclusions, or arguments based thereon.

The petition avers, inter alia, the following:

1. Thomas J. Moran died intestate on January 31, 1949, a resident of Sharon, Pa., leaving to survive him

a sister, petitioner, and Leslie E. Flower, Gloria A. Flower and Maralyn Flower, children of a deceased sister, Anna E. Flower.

2. That one Betty Jean Moran, by marriage now Smith, claims to be the sole heir of decedent, her claim being based upon a decree of adoption entered at September term, 1947, no. 76 A, in the Orphans' Court of Mercer County, wherein it was decreed on December 29, 1947, that Betty Jean Moran Smith, then Betty Jean Vasconi, who was an adult 22 years of age, be the adopted daughter of decedent, and that she take the name of Betty Jean Moran, the law with respect thereto having been complied with.

5. That at the hearing had December 29, 1947, upon decedent's petition to adopt Betty Jean Vasconi, the only witnesses testifying were Betty Jean Vasconi, her mother and decedent. Betty Jean Vasconi testified that her mother was married to decedent. Her mother testified that her name was Nora Marie Moran and that she was married to decedent. And decedent testified that he was married to Nora Marie Moran, mother of Betty Jean Vasconi.

7. On September 8, 1945, the mother of Betty Jean Moran and decedent signed a writing (not directly quoted nor exhibited to the court) which recites, inter alia, that she was a female above the age of consent, in her right mind, was not asleep or drunk nor under the influence of drugs or narcotics, that decedent was not using any force, threats or promises to influence her; that she did not expect or want him to marry her. She agreed therein never to appear as a witness against him nor to prosecute him for violation of the Mann White Slave Act. In November 1945 the mother of Betty Jean Moran and Thomas J. Moran traveled together from Sharon, Pa., to Lake Worth in the State of Florida. Early in March 1946 the mother of Betty

Jean Moran and Thomas J. Moran traveled together from Lake Worth, Fla., to Sharon, Pa.

The petition declares that decedent was not a fit person to whom to commit by adoption any person, male or female, minor or adult.

Summarized, the claim of petitioner is that the mother of Betty Jean Moran and Thomas J. Moran were not married and that when these three persons testified in the adoption proceedings that decedent was married to Betty Jean's mother, a fraud was perpetrated upon the court of the character which requires the court to revoke the adoption.

The preliminary objections to the petition for revocation are:

"(1) The facts alleged in said petition are not sufficient in law to warrant the revoking and cancelling of said decree of adoption.

"(2) The petitioner, as a collateral heir of decedent, Thomas J. Moran, has no standing in law to institute said proceedings.

"(3) The time of the presentation of the petition is too remote from the time of entering of the decree.

"(4) The allegations of fraud set forth in said petition are not sufficient to warrant the Court in setting aside a decree of adoption.

"(5) The petitioner's rights rise no higher than Thomas J. Moran, the adopting parent, and if, as alleged in the petition, fraud was committed on the Court, he would be in pari delicto with the respondent, Nora Marie Vasconi also known as Nora Marie Moran."

Petitioner's brief urges that the filing of preliminary objections admits the facts averred in the petition to revoke.

Petitioner then argues that the court is to assume the following facts:

"1. Nora Marie Vasconi intended to secure Moran's estate, was unable to induce him to marry her, and then conceived the scheme of having him *adopt* her adult daughter, and sought thus to bring his estate within her family.

"2. That Betty Jean Vasconi testified falsely at the adoption hearing, and that the testimony of Nora Marie Vasconi and Moran constituted willful and corrupt perjury.

"3. That Moran lived in adultery with Nora Marie Vasconi until the death of his wife, and thereafter until and at the time of the hearing he lived with her in a meretricious relationship."

(The foregoing quotations are purely inferences and conclusions which would require us to ignore the previous specific findings of the court, entered, after hearing, in the decree of adoption.)

"4. That Moran was guilty of a violation of the Mann White Slave Act in transporting Nora Marie Vasconi from Pennsylvania to Florida and return, living with her as aforesaid.

"5. That Nora Marie Vasconi wrote and both she and Moran signed the paper *quoted* in the petition, defining the adulterous and meretricious relationship in which they lived, and couched in language so vile, vulgar and foul that it soils the records of this court and offends public decency."

The paper referred to is not *quoted* in the petition, nor is a copy attached thereto. The foregoing quotations are the inferences or conclusions which petitioner draws from the paper.

Respondent's brief disputes petitioner's right, as a collateral heir of decedent, to challenge the adoption decree, citing Wolf's Appeal, 10 Sadler 139, 13 Atl. 760, 16 A. L. R. 1020; Brown's Adoption, 25 Pa. Superior Ct. 259; Mullany's Adoption, 25 Pa. C. C. 561; and Bird v. Young, 56 Ohio 210, 46 N. E. 819.

Respondent also contends that a judgment or decree will not be disturbed after expiration of the term except for extrinsic or collateral fraud, citing McEvoy v. Quaker City Cab Co., 267 Pa. 527, for definition and illustration of extrinsic fraud, and quoting therefrom the following:

"The general rule is that an act for which a court of equity will set aside or annul a judgment between the same parties, rendered by a court of competent jurisdiction, has relation to fraud extrinsic or collateral to the matter tried by the first court, not to fraud in the matter on which the judgment was rendered."

Respondent also quotes from Greiner v. Brubaker, 151 Pa. Superior Ct. 515:

"The rule that judgments and decrees that have been adjudicated after full hearing in court, without appeal, will not be opened for intrinsic fraud—as distinguished from extrinsic fraud— is in force in Pennsylvania; and perjury on such trial or hearing is intrinsic fraud."

Respondent also quotes from 1 Am. Jur. 673, §72:

"Proceedings to avoid a judgment of adoption are clearly of an equitable nature, and after the lapse of many years, during which time the status of the subject of adoption has been recognized as legally fixed by the judgment, by all parties to the proceedings, one of those parties, on whose motion the judgment was rendered, is in no position to appeal to equity to declare it void."

Respondent quotes from Bird et al. v. Young, 56 Ohio 210, 46 N. E. 819, as follows:

"Courts are not ordinarily open for the purpose of setting aside action taken and entries made on motion of the party who has procured them. And if the ancestor would be estopped to ask a vacation of this entry on the ground stated, how can those who stand as privies in blood, and acquire their rights, if any they

have, directly from him, have any better right to be heard?"

Respondent urges further that if there was fraud, decedent participated therein and, being in pari delicto, neither he nor his representative may ask to have the decree vacated, quoting Green et al. v. Fitzpatrick et al., 220 Ky. 590, 295 S. W. 896:

"The question for our solution is: Whether the decree whereby defendant was given the status of heir to the deceased . . . may be set aside by either himself, if living, or his heirs, if he is dead, for a reason in which he participated when it involved unlawful and immoral acts and conduct on his part. We can detect no difference between the application of the in pari delicto doctrine when presented in a case like this one and when relied on in a proceeding to cancel and nullify a deed or other writing containing the same or similar vice, and the general tenor of the decisions and authorities is to that effect, although there may be a few opinions to the contrary."

Petitioner for revocation relies principally upon Tucker et al. v. Fiske, 154 Mass. 574, 28 N. E. 1051 (1891). From the syllabus of that case, petitioner quotes (28 N. E. 1051):

"A decree of adoption, made by the probate court on petition of a person of unsound mind, which was procured by the person adopted by means of fraud and undue influence, and by concealment of such mental unsoundness from the Court, may, after the death of the petitioner, be annulled on the application of the next of kin, who were out of the state at the time of the adoption proceedings, and had no knowledge of petitioner's mental unsoundness until after her death."

Petitioner quotes further from that opinion:

"The respondent further insists that the petitioners have no standing in court, and no right to be heard. It is true that the next of kin of Eliza Jane Fisk could

not have appealed from the decree of adoption during her lifetime. The only way in which they could have attacked it would have been to procure the appointment of a guardian, who could have taken an appeal or other proceedings in her name. Whether, in case they had petitioned for the appointment of a guardian, and the probate court had refused to appoint one, that would have been conclusive upon them in any subsequent proceedings, we do not now consider. The petitioners lived out of the state at the time when the adoption proceedings were instituted, and do still so reside, and were entirely ignorant, till after the death of the said Eliza of her condition, and of the facts attending the adoption. If they cannot now be heard, there would seem to be no way in which the adoption proceedings, however fraudulent, can be reached, and the death of Eliza will have operated to clothe the defendant's fraud with immunity from attack. We do not think her death can have that result. But for the alleged adoption, the petitioners, who were the next of kin of Eliza, would have been her heirs at law. If the adoption proceeding should turn out for any reason to be invalid, they will be entitled to her estate as her heirs at law."

Courts are notably responsive upon a showing that a party to a proceeding was insane when a decree was entered against him. This circumstance alone is sufficient to distinguish the case quoted from the instant case. At the oral argument we asked petitioner's counsel if there was any claim that decedent was mentally deficient when the decree of adoption was entered. The reply was a definite "No".

Since present petitioner leans heavily upon Tucker v. Fiske (Mass.), supra, and since that decision is contra to the decision of our own Supreme Court in Wolf's Appeal, 22 W. N. C. 93 (10 Sadler 139), it may be worthwhile to determine exactly what was decided in Tucker v. Fiske.

Petitioner's brief declares that Wolf's Appeal is antiquated. The fact is that the opinion is dated 1888; the Tucker v. Fiske case is more recent by only three years.

Petitioner emphasizes that the person adopted in Wolf's Appeal was a minor whereas Betty Jean Moran was 22 years of age at the adoption. Perhaps the infancy of the person to be adopted imposes a somewhat more exacting burden upon the court, nevertheless the same statute regulates adoption of both adults and minors. In all instances the same specific findings are required. All decrees of adoption create identical rights and obligations, whether the person to be adopted be a minor or an adult.

Returning to a consideration of Tucker v. Fiske: That matter was initiated by the next of kin of a decedent who averred that decedent was insane when by undue influence she was induced to adopt an individual who was now claiming decedent's entire estate. The probate judge who heard the petition dismissed it because the averments were not sustained. Thereupon the next of kin appealed to one of the justices of the Supreme Judicial Court who held that there was no appeal from a decree of adoption and that, even if there were, the next of kin had no standing to appeal. This conclusion of the single justice was referred to the full bench of the Supreme Judicial Court. A divided court held that the matter was appealable and that the next of kin had the right to be heard. The Supreme Judicial Court declared the petition lacking in necessary averments but considered the case as though the omissions had been supplied by amendment. It will be hereinafter noted that the Supreme Judicial Court did not hold that proof of insanity and undue influence was sufficient to require revocation of the adoption.

This same case came before the Supreme Judicial Court again in 157 Mass. 83, 31 N. E. 715.

In 28 N. E. 1051 the Supreme Judicial Court had declared the right of the next of kin to appeal to a single justice of the Supreme Judicial Court from the decision of the hearing judge who had dismissed the petition for revocation. Following this order of the full court the matter was reinstated for hearing of the appeal by one justice of the Supreme Judicial Court. In pursuance of a Massachusetts statute which provides for the framing of an issue in probate appeals, the next of kin requested the justice of the Supreme Judicial Court to frame an issue as to the insanity of decedent, his subjection to undue influence, and concealment of the facts from the judge who had entered the decree of adoption. The justice declined to frame the issue and the matter was again referred to the full court.

The following quotation from the opinion of the Supreme Judicial Court, 157 Mass. 83 at p. 85 illustrates the caution to be exercised by the court in a proceeding to revoke a decree of adoption:

"That decree (of adoption) cannot be set aside merely upon proof that the judge came to a wrong conclusion. It must be shown that the fraud was practiced upon him. Until that is done the decree stands.

"The findings of a jury upon the issues proposed (insanity, undue influence, concealment from the court) even if favorable to the appellants (the next of kin) would not settle the question whether the decree should be annulled. The Court would still have that question to determine. Although upon such evidence as might now be presented, it might at this time be found *that she was insane, and also under influence at the time of the entry of the decree of adoption*, it would not follow as a legal consequence, that the judge of the probate court was imposed on in 1884." (Italics supplied.)

McKay v. Kean, 167 Mass. 524, 46 N. E. 120, involved the petition of next of kin to revoke a decree of adoption procured by their decedent when, it was averred, he was insane and subjected to undue influence, which facts were concealed from the court in the adoption proceeding. The Supreme Judicial Court declared:

"We cannot adopt the petitioner's contention that the decrees of adoption (of two individuals) are necessarily void if the petitioner for adoption were insane. If that were so, it would only be necessary, in any case where they are material, to show the fact of insanity. . . . The decrees involved an adjudication that the original petitioner was a proper person to make the petition, and to enter into the relation of parent by adoption. The ordinary presumption of sanity relieved the court from the necessity of taking testimony on this point, if no question was made about it; but the making of *the decree in each case was a sufficient adjudication of everything in the condition or conduct of the original petitioner necessary to give the decree validity* (p. 528).

"The present cases are peculiar in their nature. The petitioner asked the Court to set aside two of its decrees, which have all presumptions in their favor. In these cases (as in, citations), there are considerations of public policy which may well induce the Court to exercise its power with great caution, and only if the rights of the parties are clear. The necessary inquiry relates ultimately, not merely to the *condition or conduct of either of the persons* referred to in the petitions for adoption, but to the *effect of their condition or conduct upon the Court* in making its decrees" (p. 526). (Italics supplied.)

Turning to Pennsylvania cases, we find few that are pertinent. Petitioner cites Brindle Will, 360 Pa. 52, where the court said:

"No court overlooks or condones fraud. . . . On the contrary, the law strikes down fraud wherever it is met and in whatever guise it appears, irrespective of who may lose or profit thereby."

The principle is not exceptionable; however it illuminates no point here involved.

Petitioner cites Booth v. Van Allen, 7 Phila. 401, where a decree of adoption was revoked. The child had been cared for by the adopting parent under a contract for compensation payable by the natural parent. The petition failed to disclose the names of the child's parents. The court declared the adoption void for lack of consent of the parent and for the additional reason that the material facts as to parentage, etc., had been withheld from the court.

The court revoked the decree of Adoption of Sleek, 6 Dist. R. 256, for lack of consent of the parent, the child not having been supported by a charitable institution for a period of one year as required to qualify it to consent to the adoption.

In Mullany's Adoption, 25 Pa. C. C. 561, the adopting parent having died, his next of kin petitioned to revoke an adoption for the reason that the wife of the person adopted did not consent to the adoption before entry of the decree. The prayer of the petition was refused upon the authority of Wolf's Appeal, 10 Sadler 139.

In Wolf's Appeal petitioner was a resident of California temporarily in Lycoming County. The court decreed that Caroline Sankey be adopted by petitioner Samuel Sankey. Some seven years later Samuel Sankey died, and thereupon his administrator presented his petition, on behalf of the next of kin, to the court of Lycoming County praying revocation of the adoption, averring that the decree had been obtained by misrepresentation of facts. The court sustained a demurrer to the petition, saying:

"But, apart from the insufficiency of this application, what standing in court have these applicants to ask that this decree of adoption be vacated? When the proceedings were instituted and the decree of adoption made, the Court undoubtedly had jurisdiction of the subject-matter, to wit, the child, Caroline C. Sankey, and the promotion of her welfare. Immediately on the entry of the decree and thereafter she was entitled to be maintained and educated by Samuel Sankey, and on his death was entitled to inherit as his child. Nearly nine years after the decree was entered, and more than one year after the death of her adopted father, his administrator and collateral heirs come into court and ask that this decree of adoption be vacated. They are not here in the interest of nor on behalf of the innocent subject of adoption, but decidedly against the same. They are either strangers to the adoption proceedings, and therefore have no standing in court, or they are privies in blood or in law, and stand in the shoes of Samuel Sankey, through and under whom they claim. Surely Samuel Sankey, if living, would not be heard in this court questioning its decree made at his solicitation. He invoked the jurisdiction of the Court; he asked that the decree of adoption should be made; he got what he desired, and he would not now be allowed to question the means he set in motion. If any wrong was done, Samuel Sankey did it; and neither he nor those who claim under him can be permitted to take advantage of his wrong to the prejudice of an innocent party. On the argument many cases were cited where decrees of adoption have been set aside at the instance or in the interests of the adopted child; but none were cited nor will any, likely, ever be found where such decrees were revoked at the instance of the party who invoked the power of the court and sought and obtained its decree, when such revocation would be to the prejudice of the innocent child."

The Supreme Court affirmed the decision upon the opinion of the lower court.

Some twenty years later Wolf's Appeal was quoted with approval in In re Brown's Adoption, 25 Pa. Superior Ct. 259 (1904). In the latter case the decree of adoption was attacked because the record did not show that the adopting parent had even a temporary residence in the county (differing in this respect from Wolf's Appeal). The lower court dismissed the petition to revoke. In the course of its opinion the Superior Court said, p. 265, of record:

". . . upon such a motion (to revoke), every presumption which the law permits in favor of the validity of the judgments and decrees of common-law courts of general jurisdiction, having statutory jurisdiction of the subject matter, as against one who invoked the exercise of that jurisdiction or one who stands in no better position ought to be applied."

In the Brown case the petition to revoke was presented by decedent's widow who married decedent some years after the adoption. Notwithstanding that the petition was presented in behalf of decedent's natural child, the Superior Court concluded:

"It was held in Wolfe's Appeal that the next of kin of the adopting father had no standing to move for the revocation of the decree which had remained unquestioned for eleven years. This was put upon the ground that he invoked the jurisdiction of the court; he asked that the decree of adoption be made; he got what he desired, and would not, after that lapse of time, be allowed to question the means he set in motion. If any wrong was done he did it, 'and neither he nor those who claim under him can be permitted to take advantage of his wrong to the prejudice of an innocent party'."

In McQuiston's Adoption, 238 Pa. 304, decided in 1913, the Supreme Court took note of Wolf's Appeal, saying:

"The court below in dismissing the petition acted for its authority on Wolf's Appeal, 22 W. N. C. 93, a case affirmed per curiam on the opinion of the judge who heard the case."

In the McQuiston case, there is no intimation that Wolf's Appeal is no longer authoritative.

The Orphans' Court of Lancaster County, 48 Lanc. 544, declined to revoke an adoption in these circumstances: The adopting father, Frederick G. Sensenderfer, had been divorced on the grounds of adultery and was forbidden to marry his paramour, Grace Demmy, during the life of his former wife. Notwithstanding the prohibition he married Grace Demmy and thereafter adopted her minor illegitimate child, of whom he was not the father. The court concluded,

"This court itself upon the presentation of the facts in the petition to a degree first felt that there had been a certain imposition placed upon it, in that a full disclosure of the facts and circumstances were not made to it.

"After giving the matter careful consideration primarily from the standpoint of the welfare of the child, and a realistic consideration of the many ways in which the prohibition of the Pennsylvania Act of 1815 is evaded by lawful marriages in states other than Pennsylvania, and without condoning the apparently irregular and reprehensible (if not unlawful) conduct of the adopting parents this court arrives at the conclusion that at the present time the decree of adoption should not be revoked": Sensenderfer's Adoption.

In Keeler's Adoption, 52 Pa. Superior Ct. 516, an adoption was revoked upon petition of the natural mother who had not consented to the adoption. The Superior Court declared that a jurisdictional fact had been withheld from the court which invalidated the decree, interjecting, however, "No court of justice will set aside or even be led to look into a solemn judgment on light or trivial ground."

In Darlington's Adoption, 69 Pa. Superior Ct. 281, the court declined to revoke a decree of adoption upon petition of the natural mother. The petition averred lack of consent of the mother, and that the child had not been "judicially committed to the care of any person, or corporation, as destitute, homeless, abandoned" etc., as prescribed by statute. The Superior Court said, p. 284,

"The act contemplates a proceeding in court after all parties interested have had due notice, and who are to satisfy the court that the welfare of the child will be promoted by such adoption. These statutes are in derogation of the common law, yet their construction should not be narrowed so close as to defeat the legislative intent. . . .

"The statutory requirements were fully complied with, and the petitioner (for revocation, the natural mother) made no move for an appeal from that decree made in 1914, or for a rehearing of the case until 1917, so that she was conclusively bound by it."

It has been well said, that it requires more than mere irregularities to annul the relationship when entered into with honesty and purpose, especially when lived up to for many years and severed only by the hand of death: Brown's Adoption, supra.

There is a common impression that it is the decree of the court which creates the relation between petitioner and the person adopted. The Supreme Court rejects that theory,

"This case seems to have been argued and adjudged in the court below on the view that the only essential and governing fact on the question of adoption is the literal decree of the court. This is an error. *The cardinal fact is the intent of the adopting parent.* The Court has a veto power, to refuse to sanction the adoption unless satisfied that the welfare of the child will be

promoted by it, but beyond that its action is only *confirmatory* of the action of the parent, of which in the language of the statute, 'the record shall be sufficient evidence'.

". . . the decree of the Court is made the statutory evidence of a fully formed and executed *intent on the part of the adopting parent,* just as in the analagous case of a will where the intent is the cardinal fact, the law requires, that it be signed at the end thereof, as the statutory evidence that the intent is complete and executed": Peterson's Estate, 212 Pa. 453. (Italics supplied.)

Similarly, the marriage relation is established by the exchange of vows, not by virtue of the permission of the State expressed in the license nor by the participation of the clergyman or magistrate who officiates.

The record of this adoption hearing establishes beyond peradventure "the fully formed intent on the part of (Thomas J. Moran) the adopting parent to adopt Betty Jean". True, the court might have withheld consent for the benefit of Betty Jean, or might thereafter revoke its approval upon a showing that the facts upon which it rested its decree were misrepresented. However, even if we should now be convinced that by reason of misbehavior of petitioner the welfare of Betty Jean was not promoted by such adoption, it does not follow that the adoption should now be revoked, when defendant's character and conduct can no longer affect her in the slightest degree, especially so, if such revocation would be seriously detrimental to her property rights.

Adoption "severs the child from his natural family tree and engrafts him upon that of his new parentage 'for all purposes of inheritance'. . . .

"It is urged that a person should not be permitted, through the expedient of adopting a child, to attach a

stranger to the family tree, so as to enable that stranger to share in the estate of the adoptive parent's collateral relatives. The answer to this argument is that if a decedent does not wish such a 'stranger' to share in his estate, he can make a will accordingly.

". . . we examine the successive statutes historically and analytically, *steadily broadening as they do*, the status of adopted children." Cave's Estate, 326 Pa. 358. (Italics supplied.)

There was no such thing as adoption in the English common law, and prior to 1855 we had no general statute in Pennsylvania providing for such procedure: Thompson's Adoption, 290 Pa. 586.

"The general purpose of the (adoption) act in question is unmistakable; it is the expression of the humane and benevolent sentiments of the legislature that passed it towards a dependent class of our population, many members of which, by reason of conditions for which they are not responsible, and which, because of infancy they have no power to overcome, are, if not entirely helpless in the struggle of life, so far prejudiced and handicapped by their environment that fair opportunity to develop into virtuous men and women is denied them. It therefore calls for a liberal construction to the end that it may fairly accomplish the purpose of its enactment. While the act permits the adoption of children of whom such misfortune may not be affirmed, by and with the consent of the parent, *yet in every case its solicitude is for the welfare of the child, and never for the convenience of the party adopting*. Nothing could be more foreign to the purpose of the act than subjection of the child to servitude upon the application of one desiring its service. The party applying for adoption must show himself capable of providing and caring for the child in a way advantageous to the child, and the child is given him, not as

bound in servitude, but underfilial relation": McQuiston's Adoption, 238 Pa. 304, 310. (Italics supplied.)

In Russell's Estate, 284 Pa. 164, the Supreme Court said, p. 168:

"We do not minimize the fact that the legislature has passed statute after statute enlarging the rights of adopted children, as is somewhat graphically pointed out in the following extract from the opinion of the court below: 'In Commonwealth v. Nancrede 32 Pa. 389, and other cases, it was held that an adopted child was subject to collateral inheritance tax; but this was changed by the Act of June 20, 1919 P. L. 521. In Schafer v. Eneu, 54 Pa. 304, it was held that an adopted child could not take under a devise to the adopting parent for life and after her death to her children; a ruling altered by section 16 (a) and (b) of the Wills Act of 1917. In Com. v. Powel 16 W. N. C. 297, it was held that the natural parent, instead of the adopting parent, inherits from the adopted child; a state of the law altered by the Act of April 13, 1887 P. L. 53, in part, and fully by section 16(b) of the Intestate Act of 1917. In Burnett's Est. 219 Pa. 599, it was held that an adopted child could not inherit from the collateral kindred of adopting parents; a state of the law altered by the Act of May 28, 1915 P. L. 580, and by section 16(a) and (b) of the Intestate Act of 1917. In Goldstein v. Hammell, 236 Pa. 305, it was held that the adoption of a child after making a will did not avoid the will as to such child. And in Boyd's Est. 270 Pa. 504, it was held that the Wills Act of 1917 made no change in the law in this respect, but the Act of May 20, 1921, P. L. 937, has established the law otherwise.' "

To the foregoing may be added the Act of June 30, 1947, P. L. 1180, validating adoptions where the person adopting or person adopted was a nonresident at the time of the decree, also affirming the adoption not-

withstanding that the required period did not elapse between filing of the petition and the hearing; also validating the adoption notwithstanding deficiencies in the formal decree. This latest amendment was likely adopted to overcome in re Adoption of Margaret Nolan, 113 Pa. Superior Ct. 198, where a decree of adoption was reversed for the reason that 10 days had not elapsed between presentation of the petition and the date of hearing.

A decree of adoption may effect the rights and obligations of a number of persons including the person adopted, his natural parents, his next of kin, the adopting parents and their next of kin. To revoke a decree is to disturb adjudicated relationships and incidental rights or obligations at a time when it may be impossible to restore parties to the status quo ante. This is a circumstance which invokes caution.

In the adoption proceedings the court is required first to have regard for the rights of the natural parents. Unless the parents consent to the adoption or are found by the court to have forfeited their parental rights, the adoption cannot be authorized however advantageous for the person proposed to be adopted. The second requirement, in order of procedure, is a determination by the court whether the welfare of the person proposed to be adopted will be promoted by such adoption. The court has no special concern for the benefit of the adoption to the adopting parents. The proceeding is voluntary by the latter and they may not complain if the consequences are not as beneficial to them as they had expected.

The court does have power to revoke a decree of adoption. If the court was without jurisdiction the decree is void. The court is most attentive to the complaint of the natural parents if their rights were ignored. The court is likewise responsive to complaint of the adopted person that the decree was based upon

mistake or misrepresentation by the adopting parents.

While it is conceivable that some circumstances may warrant revocation of the decree upon application of the adopting parents, the reasons which would move a court to do so must be most compelling indeed. Where the petition to revoke is by the next of kin of the adopting parents, presented after the death of the latter, and which seeks to prejudice property rights of the adopted person, the court will entertain the matter only if the representations of petitioners are so clear and convincing that the only and inevitable conclusion must be that the decree was based upon fraud or otherwise works grievous injustice.

Instant petitioner rests largely upon the averment that "The decedent was not a fit person to whom to commit any person, male or female, minor or adult".

It must be obvious that the purpose of the present petition is not to rescue Betty Jean Moran from an unwholesome environment. Inasmuch as Thomas J. Moran, the adopting parent, is now deceased, an order of revocation would in no sense promote the welfare of his adopted daughter.

Summarized, the claim of petitioner is that the mother of Betty Jean Moran and Thomas J. Moran were not married and that when these three testified in the adoption proceedings that they were married, a fraud was perpetrated upon the court of the character which requires us to revoke the adoption. Petitioner bases her averment of nonmarriage upon the writing of September 8, 1945. If we assume for the moment that this writing warrants an inference of meretricious relationship and that, under the law, such a relationship once shown is presumed to have continued as such, in the absence of clear evidence to the contrary, we might, under other circumstances, be warranted in calling upon those who deny the fact to

come forward with their proofs. However, the petition for revocation is not the initial record in this case. We have before us the record of the adoption proceedings. It appears therefrom that on September 15, 1947, decedent presented his sworn petition for the adoption, averring therein that he was the husband of the mother of Betty Jean; that Betty Jean resided with petitioner and his wife, mother of Betty Jean, at 321 Idaho Street, Farrell, Pa., and that the mother of Betty Jean certified to the averments of the petition. The petition was supported by the affidavit of the Chief of Police of the City of Sharon, a man of exemplary character, long known to us as one not disposed to carelessly certify facts of which he is not adequately informed. The affidavit of this officer certified to an acquaintance of over five years with Thomas J. Moran and declares "he *knows* petitioner to be a person of respectability and fully qualified to become the adopting parent of Betty Jean Vasconi".

It further appears of record that on December 29, 1947, decedent testified in open court that he was the husband of Betty Jean's mother to whom he was married on February 8, 1946. This was corroborated by the testimony of Betty Jean's mother.

Whatever may be inferred from the writing of September 8, 1945, as to the relationship between decedent and the mother of Betty Jean, it is not inconsistent with a marriage on February 8, 1946.

Sometimes it is not too difficult to procure the signature to a will or other instrument by the employment of undue influence where the surrounding circumstances are conducive. However, quite a different situation is presented where the party executes a formal petition before a magistrate and after the lapse of a number of weeks appears in open court and offers his oral testimony in support of the petition.

Furthermore, "The existence of a meretricious relationship standing alone will not give rise to a presumption of undue influence": Weber et al. v. Kline, 293 Pa. 85.

"The concealment of a meretricious relationship between the person adopting and an adult who was adopted, by itself, is insufficient fraud to be grounds for the annulment of the adoption": 2 C. J. S., p. 435.

The testimony taken at the adoption hearing established that Betty Jean had resided with her mother and decedent at 321 Idaho Street since February 8, 1946, and that on the date of the hearing Betty Jean was a student in the senior class at Baldwin-Wallace College where she was then being maintained by decedent.

Our observation of all the parties concerned in the original hearing, their testimony, and all surrounding circumstances, clearly convinced us that the proposed adoption would promote the welfare of Betty Jean, and that the adoption was the voluntary act of Thomas J. Moran.

We are now asked to ignore our formal finding that the averments of the adoption petition were true, in favor of a writing dated two years before the hearing. Neither reason nor conscience indicates such a course. There is not the slightest hint of fraud or misrepresentation by Betty Jean. Her testimony as to the marriage of decedent was warranted by decedent's averment in the petition and by the cohabitation as husband and wife for some two years. We do not consider whether she had additional information. Even if there had been no marriage, her testimony was, in our opinion, merely an excusable misapprehension.

The consequences of affording the instant petitioner an opportunity to show misconduct of decedent and the mother of Betty Jean long before her adoption would be inconsistent with our notions of justice. The obvious

unfairness of calling upon a daughter to justify the behavior of a parent is accentuated when the demand is made after death had deprived her of the testimony of the parent, the witness most likely to be able to explain or justify alleged misbehavior.

Few persons, however blameless, escape some experience that could embarrass if paraded before the public eye with an open invitation to draw uncharitable inferences from an unreliable or only partial statement of facts. It is just that every competent adult should be held accountable for his misconduct, but if his mishavior is grievous, it should be challenged while he can speak in explanation or defense. If his conduct results in injustice to those who survive him, the court should not decline to right the wrong merely because the wrongdoer has died; however, the circumstance of death should caution the court that what seems to have been a wrong or an injustice so appears only because the dead cannot speak.

The law has consistently shown a strong inclination to close the mouth of him who is adversary to a decedent.

Petitioner, decedent's sister, seems to claim to have had rather definite and intimate knowledge regarding the whereabouts and conduct of her brother for a period preceding the adoption and continuing until his death. At least from February 8, 1946, until his death in January 31, 1949, decedent operated a hotel in the City of Farrell. During that period he maintained a home for Betty Jean and her mother, holding out the latter as his wife.

If petitioner, subsequent to the adoption, had represented to us that her brother was maintaining his adopted daughter in an immoral environment, we should have acted with dispatch. However, the instant petition was not presented until February 10, 1950, more than a year after decedent's death and more than two years after the adoption decree was entered.

At the oral argument, we enquired specifically of petitioner's counsel whether there was any claim that decedent was of impaired mental capacity at the adoption. The answer was in the negative.

There is nothing in the petition to support an inference that Betty Jean's mother had undue influence over decedent. The writing upon which petitioner relies, assuming its contents as represented by petitioner, would seem to have been intended for the benefit of decedent. If the writing warrants any inference of undue influence, it would seem more probable that the influence was exercised by the party benefited by the writing. The suggestion that the adoption was a scheme to obtain an inheritance from an unwilling owner is not impressive. Decedent was a businessman, operated a hotel for a number of years and acquired a substantial estate. Undoubtedly he was aware that he could devise and bequeath his estate without regard to the adoption.

Courts are not prone to undertake the distribution of a decedent's estate contrary to his apparent wishes.

Generally speaking, we believe justice is more likely attained through a fair hearing upon the merits of a cause than by a summary disposition upon preliminary objections. However, we are of the opinion that an attack upon an adoption calls for utmost caution on the part of the court. There is a matter of public policy involved here that cannot be ignored without dire consequences.

Quite commonly, the subject of an adoption is a minor, frequently an infant, who knows little or nothing of the details of the proceeding. If a disappointed heir, after death of the adopting parents, may call upon the adopted person to produce evidence that the behavior of the adopting parents and all the proceedings were what the record represents them to be, we shall soon have a profusion of attacks upon adoptions where

estates are of substantial value. If, as is often the case, the adopted child is of illegitimate birth, or if there be some blemish or seeming blur upon one or both of his natural parents, he might be a likely victim for the unscrupulous, if courts should indicate a readiness to review such matters without the closest scrutiny of the basis upon which a petition for revocation rests.

The legislature took note of the potential hazards and enacted that:

"Such decree, all other papers pertaining to the case and the testimony if written out shall be kept in the files of said court as a permanent record thereof and *shall be withheld from inspection,* except upon an order of court granted upon cause shown": Act of June 30, 1947, P. L. 1180, sec. 4.

The earlier statute had provided that the decree should be spread at length upon the records of the court, but that all other papers and the testimony might be withheld from inspection by a special order in the particular case.

Giving to petitioner's averments the fullest credit that can reasonably be claimed for them, they amount to no more than a claim that decedent and the mother of Betty Jean lived in an immoral relation in September and November 1945. As before observed, this is not at all inconsistent with a marriage on February 8, 1946.

Petitioner is not proposing to prove that there was no marriage on February 8, 1946. She is asking that we require the adopted child to prove the fact of marriage. Petitioner's sole reliance is upon the writing of September 8, 1945, and the inferences she draws therefrom. The aim of petitioner is to overturn a decree based upon adequate evidence, more than two years after entry of the decree.

Petitioner asks that we infer from the writing of September 8, 1945, that the testimony of Thomas J. Moran and Nora Marie Moran, given in open court on

December 29, 1947, as to a marriage on February 8, 1946, was perjury. No such inference is rationally possible.

The admissions of a party of the fact of his marriage are against his interest, and when made under circumstances of deliberation are entitled to great weight: Greenawalt v. McEnelley, 85 Pa. 352.

The sworn declaration of Thomas J. Moran, contained in both his petition for adoption and his oral testimony that he was the husband of Nora Moran, corroborated by the testimony of the latter, cannot be lightly disregarded.

In Thewlis' Estate, 217 Pa. 307, decedent had entered into a second marriage during the life of his first wife. There was no evidence of a divorce. The court declared:

"There was not only the introduction of the wife as such to strangers by the husband, but the fact that they were husband and wife was solemnly recited and declared in a deed, duly executed and acknowledged by both, to the City of Philadelphia, in December, 1896, and *in the face of this deed a finding that there was no valid marriage would be impossible.*" (Italics supplied.)

Even if we could find, as claimed by instant petitioner, that her deceased brother was a dissolute person and a perjurer, we would not be warranted in imposing harsh consequences upon his adopted daughter without evidence that she somehow participated in the misbehavior or unless she was aware of it and sought to profit by it.

Reasons of both principle and law require us to dismiss the instant petition.

### Order

And now, June 15, 1950, this matter came on for argument upon preliminary objections to the petition, and same was argued, whereupon, after due consideration, it is ordered, adjudged and decreed that the petition be dismissed.